JESSE J. DUNN,
SAMUEL W. HAYES,
JOHN B. TURNER,  } JUSTICES.
R. L. WILLIAMS,

---

SCHOOL BOARD DIST. No 18, GARVIN COUNTY, *et al.* v. THOMPSON *et al.*

No. 660.   Opinion Filed May 13, 1909.

(103 Pac. 578.)

1.  PARENT AND CHILD—Duties and Authority of Parent. At common law the principal duties of parents to their legitimate children consisted in their maintenance, their protection, and their education. While the municipal laws took care to enforce these duties, yet it was presumed that the natural love and affection implanted by Providence in the breast of every parent had done so more effectually than any law. For this reason the parent, and especially the father, was vested with supreme con-

Vol. 24—1

School Dist. No. 18 Garvin Co. v. Thompson *et al.*

trol over the child, including its education. Except where modified by statute, that authority still exists.

2. **SCHOOLS AND SCHOOL DISTRICTS—Pupils—Courses of Study —Rights of Parents.** The school authorities of this state have the power to classify and grade the scholars in their respective districts and cause them to be taught in such departments as they may deem expedient. They may also prescribe the courses of study and text-books for the use of the schools, and such reasonable rules and regulations as they may think needful. They may also require prompt attendance, respectful deportment, and diligence in study. The parent, however, has a right to make a reasonable selection from the prescribed course of study for his child to pursue, and this selection must be respected by the school authorities, as the right of the parent in that regard is superior to that of the school officers and the teachers.

(Syllabus by the Court.)

*Appeal from District Court, Garvin County; R. McMillan, Judge.*

Mandamus by J. B. Thompson and others against School Board District No. 18 Garvin County, and others. Judgment for plaintiffs, and defendants bring error. Affirmed.

*R. T. Jones,* for appellants.

*J. B. Thompson* and *Blanton & Andrews,* for appellees, citing: *Board of Education v. Purse,* 101 Ga. 422; *State ex rel. v. School Dist.,* 31 Neb. 552; *Morrow v. Wood,* 35 Wis. 59; *People ex rel. v. Trustees,* 87 Ill. 303; *Ralston v. Post,* 79 Ill. 567.

KANE, C. J. This was an action in mandamus, commenced in the district court of Garvin county by the defendants in error to compel the school authorities of the city of Pauls Valley, in said county, to reinstate their children in the public schools, from which they were expelled for the reason that under direction of their parents they refused to take singing lessons, which it seems were a part of the prescribed course of study in said schools. The school board, and teachers of the schools, were informed by the appellees that they did not wish their children to take singing lessons, that they would not supply them with the necessary singing books to do so, and requested them to excuse their children from this branch of the regular course. The school authorities refused to grant the request of appellees, and the appellees re-

fused to furnish the singing books, and the children refusing to participate in the singing exercises, were expelled. It is agreed by both sides that, when boiled down, the only question really involved in this case is whether a patron of the public schools may make a reasonable selection from a course of study prescribed by the proper school authorities for his child to pursue, in opposition to a rule prescribed by such authorities requiring the child to take all the studies in such course. The trial court decided this question in favor of the appellees, and the appellants, not being satisfied with the judgment, bring the case to this court by petition in error.

There is some conflict as to the power to suspend or expel pupils for failure to participate in certain required studies or exercises if the parents of the pupil request that the child be excused; but it seems to us that the weight of authority and the better reasoning sustain the judgment of the trial court. At common law the principal duties of parents to their legitimate children consisted in their maintenance, their protection, and their education. These duties were imposed upon principles of natural law and affection laid on them not only by Nature herself, but by their own proper act of bringing them into the world. It is true the municipal law took care to enforce these duties, though Providence has done it more effectually than any law by implanting in the breast of every parent that natural insuperable degree of affection which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress, or extinguish. 1 Lewis' Blackstone, § 447. The statutes of Oklahoma defining the relation between parent and child are in the main declaratory of the common law. Section 3763, Wilson's Rev. & Ann. St. 1903, provides that the parent entitled to the custody of a child must give him support and education suitable to his circumstances. Section 3769, Wilson's Rev. & Ann. St. 1903, provides that:

"The authority of a parent ceases, first, upon the appointment

4    SUPREME COURT OF OKLAHOMA.

School Dist. No. 18 Garvin Co. v. Thompson *et al.*

by a court of a guardian of the person of the child; second, upon the marriage of the child; third, upon its attaining majority."

Section 3768, Wilson's Rev. & Ann. St. 1903, provides that: "The abuse of parental authority is the subject of judicial cognizance in a civil action in the district court brought by the child, or by its relatives within the third degree, or by the officers of the poor where the child resides; and when the abuse is established, the child may be freed from the dominion of the parent, and the duty of support and education enforced."

Counsel for plaintiff in error states in his brief that the only law in this state that would seem to recognize the old common law is to be found in the chapter on parent and child, the chapter from which the foregoing sections are taken; but, he contends, the old common-law idea that the parent has the exclusive control over the education of the child has long since been abandoned. We must find warrant for this statement in the statutory law of the state in order to agree with counsel in this contention. At common law the parent, and especially the father, was vested with supreme control over the child, including its education, and, except where modified by statute, that authority still exists in the parent. *Board of Education of Cartersville et al. v. Purse, Next Friend, et al.,* 101 Ga. 422, 28 S. E. 896, 41 L. R. A. 593, 65 Am. St. Rep. 312. It is true that with the organization of the common school system throughout the state statutes have been passed modifying more or less the authority of the parent over the child in school matters. Before statehood the general control and management of the schools of this jurisdiction was under the general supervision and management of the superintendent of public instruction, and the district schools were under the immediate control of the district school boards. The district school boards, in so far as the branches of study to be followed in such schools after they had complied with the law requiring the studying of certain branches, might substitute any other studies that might be determined upon by them. The board was authorized under the statute to suspend from school pupils who were guilty of immoral conduct and continued violation of the rules of the school.

It is admitted that these laws in so far as they are not re-
pugnant to the Constitution of the state nor locally inapplicable,
are still in force; but counsel for plaintiff in error contends that,
no matter what the rule may have been under the old territorial
laws, there can now be no doubt that under sections 308, 311,
312, 313, and 314, Bunn's Ann. Const., the management of the
public schools is absolutely turned over to the Legislature of the
state, and that the compulsory education clause of the Constitution
absolutely destroys the old common-law doctrine that the parent
had the entire control over the education of his child, and that
the uniform text-book law of the state absolutely places the
course of study that is to be used in all the public schools in this
state in the hands of a text-book commission. The sections of
the Constitution referred to by counsel provide: (1) That the
Legislature shall establish and maintain a system of free public
schools wherein all the children of the state may be educated;
(2) that it shall provide for the compulsory attendance at some
public or other school, unless other means of education are pro-
vided, of all the children in the state who are sound in mind and
body, between the ages of 8 and 16 years, for at least three months
in each year; (3) that the supervision of instruction in the pub-
lic schools shall be vested in a board of education, whose powers and
duties shall be prescribed by law; and (4) that the Legislature
shall provide a uniform system of text-books for the common
schools of the state. To our mind the right of the board of edu-
cation to prescribe the course of study and designate the text-
books to be used does not carry with it the absolute power to re-
quire the pupils to study all of the branches prescribed in the
course in opposition to the parents' reasonable wishes in relation
to some of them.

In *Morrow v. Wood*, 35 Wis. 59, 17 Am. Rep. 471, Mr. Jus-
tice Cole, in discussing a similar proposition, says:

"It is unreasonable to suppose any scholar who attends
school can or will study all the branches taught in them. From
the nature of the case some choice must be made and some dis-
cretion be exercised as to the studies which the different pupils

shall pursue.   The parent is quite as likely ˙to make a wise and judicious selection as the teacher."

It is no argument in favor of limiting the common-law authority and control of parents over their children to say that the exercise of such power may result disastrously to the proper discipline, efficiency, and well-being of the schools.   It is to be presumed that a normal reasonable man will exercise such authority in a reasonable way.   In *Morrow v. Wood, supra,* Mr. Justice Cole, upon this proposition, says:

"We do not intend to lay down any rule which will interfere with any reasonable regulation adopted for the management and government of the public schools or which will operate against their efficiency and usefulness.   Certain studies are required to be taught in the public schools by statute.   The rights of one pupil must be so exercised, undoubtedly, as not to prejudice the equal rights of others; but the parent has the right to make a reasonable selection from the prescribed studies for his child to pursue, and this cannot possibly conflict with the equal rights of other pupils. * * * And how it will result disastrously to the proper discipline, efficiency, and well-being of the common schools, to concede this paramount right to the parent to make a reasonable choice from the studies in the prescribed course which his child shall pursue, is a proposition we cannot understand.   The counsel for the plaintiff so insist in their argument, but, as we think, without warrant for the position."

In *State v. School District No. 1, Dixon County, et al.,* 31 Neb. 552, 48 N. W. 393, the Supreme Court of Nebraska had the same question before it.   Mr. Justice Maxwell, who wrote ˙the opinion of the court, used the following language:

"Now who is to determine what studies she shall pursue in school?   A teacher who has a mere temporary interest in her welfare, or her father, who may reasonably be supposed to be desirous of pursuing such course as will best promote the happiness of his child?   The father certainly possesses superior opportunities of knowing the physical and mental capabilities of his child. It· may be apparent that all the prescribed course of studies is more than the strength of the child can undergo; or he may ˙be desirous, as is frequently the case, that his child while attending school should also take lessons in music, painting, etc., from

private teachers. This he has a right to do. The right of the parent therefore to determine what studies his child shall pursue is paramount to that of the trustees or teacher. Schools are provided by the public in which prescribed branches are taught, which are free to all within the district between certain ages; but no pupil attending the school can be compelled to study any prescribed branch against the protest of the parent that the child shall not study such branch, and any rule or regulation that requires the pupil to continue such studies is arbitrary and unreasonable. There is no good reason why the failure of one or more pupils to study one or more prescribed branches should result disastrously to the proper discipline, efficiency, and well-being of the school. Such pupils are not idle, but merely devoting their attention to other branches; and so long as the failure of the students, thus excepted, to study all the branches of the prescribed course, does not prejudice the equal rights of other students, there is no cause for complaint."

The same question was also decided by the Supreme Court of Illinois in the case of *Trustees of Schools v. People,* 87 Ill. 303, 29 Am. Rep. 55. In that case Mr. Chief Justice Scholfield, who delivered the opinion of the court, says:

"But no attempt has hitherto been made in this state to deny, by law, all control by the parent over the education of his child. Upon the contrary, the policy of our law has ever been to recognize the right of the parent to determine to what extent his child shall be educated, during minority, presuming that his natural affections and superior opportunities of knowing the physical and mental capabilities and future prospects of his child will insure the adoption of that course which will most effectually promote the child's welfare. The policy of the school law is only to withdraw from the parent the right to select the branches to be studied by the child, to the extent that the exercise of that right would interfere with the system of instruction prescribed for the school, and its efficiency in imparting education to all entitled to share in its benefits. No particular branch of study is compulsory upon those who attend schools; but schools are simply provided by the public in which prescribed branches are taught, which are free to all within the district between certain ages. In most primary schools it would be both absurd and impracticable to require every pupil to pursue the same study at the same time.

Discrimination and preference between different branches of study, until some degree of advancement is attained, is inevitable, and, afterwards, a due regard for the interest of the child will always require it, in greater or less degree. It is not claimed that every pupil attending high school must pursue every study taught therein, and manifestly, in the absence of legislation expressly requiring this, a regulation to that effect would be regarded as arbitrary and unreasonable, and could not therefore receive the sanction of the courts. Conceding that all the branches of study decided to be taught in the school shall not necessarily be pursued by every pupil, we are unable to perceive how it can, in any wise, prejudice the school, if one branch rather than another be omitted from the course of study of a particular pupil."

Further, upon the same question, the learned Chief Justice says:

"It is possible that a father may have very satisfactory reasons for having his son perfected in certain branches of education to the entire exclusion of others; and so long as, in exercising his parental authority in making the selection of the branches he shall pursue, none others are affected, it can be of no practical concern to those having the public schools in charge."

The foregoing cases, it seems to us, state the true rule, and there are no provisions in our Constitutions or laws that make it inexpedient to apply it here. Our laws pertaining to the school system of the state are so framed that the parent may exercise the fullest authority over the child without in any wise impairing the efficiency of the system. The only decided departure from the common-law rule is the section of our Constitution providing for the compulsory attendance at some public or other school, unless other means of education are provided, of all the children of the state who are sound in mind and body, between the ages of 8 and 16 years, for at least three months in each year. Blackstone says that the greatest duty of parents to their children is that of giving them an education suitable to their station in life; a duty pointed out by reason, and of far the greatest importance of any. But this duty at common law was not compulsory; the common law presuming that the natural love and affection of the parents for their children would impel them to faithfully perform this

duty, and deeming it punishment enough to leave the parent, who neglects the instruction of his family, to labor under those griefs and inconveniences which his family, so uninstructed, will be sure to bring upon him. Lewis' Blackstone, book 1, § 451. Our Constitution provides for compulsory education; but it leaves the parents free to a great extent to select the course of study. They may send their children to public schools and require them to take such of the studies prescribed by the rules as will not interfere with the efficiency or discipline of the schools, or they may withdraw them entirely from ,the public schools and send them to private schools, or provide for them other means of education.

Under our form of government, and at common law, the home is considered the keystone of the governmental structure. In this empire parents rule supreme during the minority of their children. After speaking of the power of parents over their children under the civil law, Judge Blackstone, in his commentaries, speaking of the corresponding power under the common law, says:

"The power of a parent by our English laws is much more moderate, but still sufficient to keep the child in order and obedience. He may lawfully correct his child, being under age, in a reasonable manner, for this is for the benefit of his education. The consent or concurrence of the parent to the marriage of his child under age was also directed by our ancient law to be obtained; but now it is absolutely necessary, for without it the contract is void. And this also is another means, which the law has put into the parent's hands, in order the better to discharge his duty." (Lewis' Blackstone, book 1, §§ 452, 453.)

Again, in section 453, the learned commentator says:

"The legal power of a father—for a mother, as such, is entitled to no power, but only to reverence and respect—the power of a father, I say, over the persons of his children, ceases at the age of twenty-one, for they are then enfranchised by arriving at years of discretion, or that point which the law has established, as some must necessarily be established, when the empire of the father, or other guardian, gives place to the empire of reason. Yet, till that age arrives, this empire of the father continues even after his death, for he may by his will appoint a guardian to his children. He may also delegate part of his parental authority,

during his life, to the tutor or schoolmaster of his child, who is then in *loco parentis,* and has such a portion of the power of the parent committed to his charge, viz., that of restraint and correction, as may be necessary to answer the purposes for which he is employed."

It is clear that neither the statute or common law gives to the teacher or school officers the exclusive authority they claim in this case over the children of the patrons of the public schools, unless they get it upon the theory that the mere act of sending the children to school amounts to a delegation of the parental authority which the law of the land places in the hands of the parent; but this contention is fully answered by Mr. Justice Cole in *Morrow v. Wood, supra:* "Whence," asks the learned justice, " * * * did the teacher derive this exclusive and paramount authority over the child, and the right to direct his studies contrary to the wish of the father? It seems to us it is idle to say the parent, by sending his child to school, impliedly clothes the teacher with that power, in a case where the parent expressly reserves the right to himself, and refuses to submit to the judgment of the teacher the question as to what studies his boy should pursue."

We have made careful examination of the authorities directly in point on the question presented by the record here and have found that the courts of last resort of four states have passed squarely upon it. Three of the states, Illinois, Nebraska, and Wisconsin, sustain our views. A case from Indiana (*State v. Webber et al.,* 108 Ind. 31, 8 N. E. 708, 58 Am. Rep. 30), seems to take the contrary view. Mr. Chief Justice Howk, who delivered the opinion of the court in *State v. Webber, supra,* based his opinion upon the fact that the parent did not assign any cause or reason why his son should not participate in the musical studies and exercises of the high school, and that therefore it may be fairly assumed that he had none. We believe the presumption ought to be the other way. There are certain virtues that may safely be attributed to the generality of mankind, among which are love of country and love of offspring. The perpetuation of the

public school system of the state is probably as dear to the defendants in error as it is to the plaintiffs in error, and their interest in its efficiency, discipline, and course of study as deep. They undoubtedly approve of the entire curriculum, except the singing lessons. We think it would be a reversal of the natural order of things to presume that a parent would arbitrarily and without cause or reason insist on dictating the course of study of his child in opposition to the course established by the school authorities. A better rule, we think, would be to presume, in the absence of proof to the contrary, that the request of the parent was reasonable and just, to the best interest of the child, and not detrimental to the discipline and efficiency of the school. The school authorities of the state have the power to classify and grade the scholars in their respective districts and cause them to be taught in such departments as they may deem expedient. They may also prescribe the courses of study and text-books for the use of the schools, and such reasonable rules and regulations as they may think needful. They may also require prompt attendance, respectful deportment, and diligence in study. The parent, however, has a right to make a reasonable selection from the prescribed course of study for his child to pursue, and this selection must be respected by the school authorities, as the right of the parent in that regard is superior to that of the school officers and the teachers.

Counsel for plaintiff in error has cited several other cases to support his contention; but the ones we have heretofore noticed are all that, to our mind, are directly in point. *Donahoe v. Richards et al.*, 38 Me. 376, was a case where a pupil was expelled for noncompliance with a rule requiring a scholar to take part in the Bible exercises, although the pupil was willing to read from the "Douay" version. The parent brought an action on the case for such expulsion. It was held: That the parent could not recover, as there was no act done by which the ability of the child to render service was diminished; that the school was for the ben-

efit and instruction of the pupil; that, if the pupil's rights have been violated, she alone was entitled to compensation.

Another case often cited in support of the contention of appellant is *Spiller v. Woburn*, 12 Allen (Mass.) 127. In that case it was held that damages could not be recovered where a pupil was expelled from a public school for refusing to comply with a regulation requiring the pupils to bow their heads in morning prayer exercises, unless the parent of the pupil should request that such pupil be excused therefrom. The parent declined to make any request and directed his child not to obey the rule. It was held that the regulation was a reasonable one in the interest of quiet and decorum, and did not infringe on the religious liberty of the pupil.

It would serve no good purpose to note further this line of decisions. They are so different from the case at bar that they are valueless as authority upon the exact question involved. The difference between that class of cases and the case at bar is illustrated by *McCormick v. Burt et al.*, 95 Ill. 263, 35 Am. Rep. 163, one of the states followed by us in this opinion. In that case it was held that that the expulsion of a pupil for nonobservance of a rule requiring pupils to lay aside their books during the opening exercise while the Bible is being read did not authorize an action on the case for damages, where there was no allegation that the suspension was either wantonly or maliciously done. In this school no one was required to be present at such exercises unless he chose to do so; but the pupil insisted that the rule interfered with the religious convictions of himself and his father. None of this class of cases touch the identical question involved in the case at bar, although the relation of parent and child in school matters, and the powers and duties of the school authorities are discussed generally.

We believe the court below reached the right conclusion, and its judgment is therefore affirmed.

All the Justices concur.